[Crim. No. 9855. In Bank. Aug. 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. HARRY W. SCHADER, Defendant and Appellant.

766

Elfriede F. Sobiloff, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edward A. Hinz, Jr., Edsel W. Haws and Charles G. Warner, Deputy Attorneys General, for Plaintiff and Respondent.

TOBRINER, J.—The jury convicted defendant of first degree robbery and of the first degree murder of Police Officer Eugene McKnight in Sacramento on July 23, 1963, and fixed the penalty at death. His appeal is automatic. (Pen. Code, § 1239, subd. (b).) Defendant presents manifold contentions relating to his guilt trial, but we do not find prejudicial error in the conduct of the guilt trial. We must reverse the judgment as to penalty, however, because the trial court excluded veniremen from the jury panel in violation of the principles

set forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

Defendant shot Officer McKnight after a brief struggle in the parking lot of a Lucky Market at about 7 p.m., moments after codefendant Turner[1] robbed the market's cash registers at gunpoint. Although he had been in the general vicinity of the checkstands during the robbery, defendant displayed no weapon and played no active role. He followed Turner out of the market a few seconds after Turner emptied the last register. The prosecution sought to prove both that defendant premeditated the killing during the moments of struggle and that the killing occurred during the escape phase of the robbery. The prosecution contended that Turner and defendant jointly planned and committed the robbery and that defendant was to serve as a lookout, ready to assist Turner in case of emergency. Schader testified in his own defense that he had planned to commit *a robbery* with Turner and indeed was casing the market for an anticipated *later robbery,* but asserted that he had no idea that Turner would commit *the particular robbery* at the time it actually occurred. Defendant admitted cocking his pistol during the struggle, but claimed that the shooting was accidental.

After defendant offered his explanation for his presence at the scene of the robbery, the trial court permitted the prosecution, over defendant's objection, to engage in two lines of cross-examination which defendant assigns as reversible error.

The prosecutor cross-examined defendant upon the details of a robbery for which defendant was convicted in 1957. He offered the testimony ''to show common scheme, plan, or design; and most particularly, to show intent at the time of the offense charged.'' The trial court permitted the prosecutor to inquire into similarities in the two offenses: in each case, the robbers chose a supermarket as the target; the defendant worked with a single partner, a relative; the perpetrators used a stolen car for escape; one partner robbed cash registers, displaying a loaded pistol which was subsequently concealed; the other partner, standing by unobtrusively, but armed with a loaded pistol, was available to participate in case of trouble. The prosecutor used the testimony thus obtained in his vigorous argument to the jury that defendant in the instant robbery ''played the same role that Uncle Gilbert played down in Los Angeles, in an identical robbery

---

[1]The jury found Turner not guilty of murder, and guilty of armed robbery.

. . . ready to put a couple through the ceiling if somebody panicked.''

The prosecution also introduced into evidence, a conditional sales contract for a red Cadillac convertible which showed that defendant faced a payment of $900 several days after the robbery. The People cross-examined defendant about this document. In his closing argument to the jury, the prosecutor urged that the impending payment formed the motive for the robbery. He heavily emphasized the rhetorical question, ''What did he put in the scales of justice—a big red Cadillac on one side, and the life of a human being, Officer McKnight, on the other?''

Defendant attacks both lines of cross-examination as beyond the scope of direct examination; he objects to the admission of the conditional sales contract, and the concomittant cross-examination on the further ground that the contract was discovered as the fruit of an interrogation previously held by this court to have been conducted in violation of defendant's constitutional rights (*People* v. *Schader* (1965) 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665]). In view of his admission of his general intention to commit robbery, defendant argues that cross-examination upon the details of the prior robbery could not fall under any exception to the general rule proscribing close inquiry into prior convictions. We explain why we uphold the cross-examination upon the details of the prior robbery; we find the admission of the sales contract erroneous but not prejudicial.

### 1. *Alleged improper general scope of cross-examination*

Setting aside for the moment the special rules pertaining to the admissibility of evidence of fruits of improper interrogation and of prior felony convictions, we find that general principles delimiting the scope of permissible cross-examination justified the prosecutor's inquiry.

We are not unmindful of a basic principle of criminal justice which makes the provision of former Penal Code section 1323 (now see Evid. Code, § 773, subd. (a)), limiting cross-examination of a defendant to ''those matters about which he was examined in chief,'' an indispensable ally of the federal and state constitutional rights guaranteeing that a person shall not ''be compelled in any criminal case to be a witness against himself.'' (Cal. Const., art. I, § 13; U. S. Const., 5th Amend.; see *People* v. *Arrighini* (1898) 122 Cal. 121, 126 [54 P. 591]; *People* v. *Sims* (1958) 165 Cal.App.2d

108, 113 [331 P.2d 799].) We recognize, of course, with the United States Supreme Court, "that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. . . . Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against the accused out of his own mouth." (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7-8 [12 L.Ed.2d 653, 658-659, 84 S.Ct. 1489].) The People must "shoulder the entire load" of their burden of proof in their case in chief, without assistance either from the defendant's silence or from his compelled testimony. (*Tehan* v. *Shott* (1966) 382 U.S. 406, 415 [15 L.Ed.2d 453, 459, 86 S.Ct. 459]; *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *Murphy* v. *Waterfront Com.* (1964) 378 U.S. 52 [12 L.Ed.2d 678, 84 S.Ct. 1594]; 8 Wigmore, Evidence (McNaughton rev. 1961) p. 317.)

 Even when a defendant chooses to offer testimony on his own behalf, the privilege against self-incrimination serves "to prevent the prosecution from questioning the defendant upon the case generally, and in effect making him its own witness." (*People* v. *Gallagher* (1893) 100 Cal. 466, 475 [35 P. 80]; *People* v. *O'Brien* (1885) 66 Cal. 602 [6 P. 695]; *People* v. *Sims, supra,* 165 Cal.App.2d 108, 113.) Such general compelled cross-examination would not only post the same "cruel trilemma of self-accusation, perjury or contempt" recognized in *Murphy* v. *Waterfront Com., supra,* 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594]; it would also penalize and thereby deter a defendant's assertion of his right to take the witness stand to explain or contradict a particular aspect of the case against him.[2]

 None of these fundamental principles, however, imply that when a defendant voluntarily testifies in his own defense the People may not fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them. The provision of former Penal Code section 1323 "does not mean that the cross-examination must be confined to a mere categorial review of

[2]For instances of the effect of this deterrence, see Borchard, Convicting the Innocent (1932) pp. 138, 232, 365-366; Frank, Not Guilty (1957) pp. 106-107.

the matters, dates or times mentioned in the direct examination. . . . It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on direct examination." (*People* v. *Pike* (1962) 58 Cal.2d 70, 90 [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Zerillo* (1950) 36 Cal.2d 222, 228 [223 P.2d 223].)[3]

Defendant took the stand to meet the People's evidence which showed that he was present and armed during the robbery, that he fled immediately thereafter, and that he shot Officer McKnight. His testimony covered events and circumstances beginning with his conspiracy to commit a robbery with codefendant Turner, through his activities in casing the market, his alleged surprise when he discovered that Turner had decided to commit the robbery by himself then and there, and his apprehension in the parking lot by Officer McKnight, and beyond his struggle and killing of the police officer. Such complete direct testimony placed in issue his motives, intent and state of mind during the robbery. Cross-examination which revealed those motives, intent and state of mind was therefore not prohibited under general strictures limiting the scope of cross-examination. (See *People* v. *Perez* (1967) 65 Cal.2d 615, 621 [55 Cal.Rptr. 909, 422 P.2d 597], cert. granted (1968) 390 U.S. 942 [19 L.Ed.2d 1131, 88 S.Ct. 1055]; *People* v. *Ing* (1967) 65 Cal.2d 603, 611 [55 Cal.Rptr. 902, 422 P.2d 590].)

Defendant contends alternatively that other, more specific rules render impermissible cross-examination upon the details of his prior conviction and upon the conditional sales contract. We deal first with the details of the prior conviction.

*2. Alleged improper admission of details of prior robbery.*

We point out that since the cross-examination upon the details of the prior robbery possessed sufficient probative value to outweigh its obviously prejudicial effect, the trial court properly admitted it. We show that the prosecution, in order to overcome defendant's claim that he did not participate in the robbery that actually occurred, presented evidence of a common *modus operandi* to prove defendant's guilty knowledge, his intent, and his state of mind during the killing of Officer McKnight.

---

[3]Defendant's attempted distinction of *Pike* and *Zerillo* encompasses two arguments, one relating to the general limitation on the scope of cross-examination, with which we are concerned here, and the other relating to the extrinsic policy of exclusion of evidence of other crimes because of its prejudicial effect. We deal with the latter issue *infra* at footnote 13, page 775, and accompanying text.

■ We begin with the basic premise that, save for certain recognized exceptions, evidence of other offenses may not be introduced in a criminal prosecution.[4] Obviously such evidence of other conduct should be excluded if it does not substantially tend to prove any fact other than the criminal character of the accused. ■ "[T]he defendant can be tried for no other offense than that [with] which he is charged." (*People* v. *Albertson, supra,* 23 Cal.2d 550, 576.) He should not be confronted with attempted proof of other offenses interjected only to prove a criminal propensity that might have led him to the commission of other crimes.[5] "General bad character . . . has not yet become a criminal offense in our scheme." (*Michelson* v. *United States* (1948) 335 U.S. 469, 489 [93 L.Ed. 168, 180, 69 S.Ct. 213] (Rutledge, J., dissenting).) We exclude such evidence of other crimes not because it lacks probative value but because its prejudicial effect outweighs its probative value.[6] We have thus reached

---

[4]*People* v. *Haston* (1968) 69 Cal.2d 233, 243 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Cramer* (1967) 67 Cal.2d 126, 129 [60 Cal.Rptr. 230, 429 P.2d 582]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 238 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Albertson* (1944) 23 Cal.2d 550, 576 [145 P.2d 7]; 18 Cal.Jur.2d, Evidence, § 136, pp. 583-585; 22A C.J.S., Criminal Law, § 682, p. 729 et seq.; Fricke & Alarcon, Cal. Criminal Evidence (7th ed. 1966) pp. 313, 320; Witkin, Cal. Evidence (2d ed. 1966) §§ 340-345, pp. 299-306.

The basic rule that "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice . . ." (Evid. Code, § 352; A.L.I., Model Code of Evidence, § 303) underlies special rules governing admissibility. From the point of view of trial procedure, after the defendant has raised the objection that proffered evidence shows another offense, the burden is on the People to establish admissibility. Finally, as a substantive rule of law, evidence of other offenses is presumed inadmissible unless its place within a recognized exception is "clearly perceived." (*People* v. *Albertson, supra,* 23 Cal.2d 550, 557; *People* v. *Haston, supra,* 69 Cal.2d 233, 244.)

Evidence of other offenses may also "tend" to establish a material fact to the same extent as other admissible circumstantial evidence not revealing the commission of a crime and yet be excluded for the extrinsic policy reason that "the probative value of such evidence is outweighed by its prejudicial effect." (*People* v. *Kelley, supra,* 66 Cal.2d at p. 238; *People* v. *McCaughan* (1957) 49 Cal.2d 409, 421 [317 P.2d 974]; *People* v. *Sykes* (1955) 44 Cal.2d 166, 175 [280 P.2d 769] (Traynor, J., dissenting); *People* v. *Westek* (1948) 31 Cal.2d 469, 476 [190 P.2d 9].)

[5]*People* v. *Albertson, supra,* 23 Cal.2d 550, 576; *People* v. *Beverly* (1965) 233 Cal.App.2d 702, 720 [43 Cal.Rptr. 743]; *People* v. *Musumeci* (1955) 133 Cal.App.2d 354, 362 [284 P.2d 168]. See also, 7 Cal. Law Revision Com. Rep.: Evidence Code with Official Comments, pp. 1205-1206; Witkin, Cal. Evidence (2d ed. 1966) § 340, p. 299; Fricke, Cal. Criminal Evidence (6th ed. 1964) p. 290. See generally, Note (1964) 78 Harv. L.Rev. 426; Note (1947) 35 Cal.L.Rev. 131.

[6]"The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance

the conclusion that the risk of convicting the innocent by the admission of evidence of other offenses is sufficiently imminent for us to forego the slight marginal gain in punishing the guilty.[7]

We recognize, however, exceptions to the basic rule. ■ If a defendant chooses to testify, the People may impeach his credibility by showing that he has previously been convicted of a felony. Even here, however, impeachment evidence of prior felony convictions must be limited to identification of the conviction, and "the courts will be zealous to insure that the prosecuting attorney is not permitted to delve into the details and circumstances of the prior crime (*People* v. *David* (1939) 12 Cal.2d 639, 646 . . .). . . . " (*People* v. *Smith* (1966) 63 Cal.2d 779, 790 [48 Cal.Rptr. 382, 409 P.2d 222].)

The prosecutor in the instant case, by inquiring into the details of the prior robbery, sought to take advantage of a broader exception to the basic rule of exclusion. ■ Generally stated, this exception permits the People to adduce as circumstantial proof of the crime charged evidence encompassing the commission of a similar or related offense when the probative value of such evidence outweighs its prejudicial effect. (*People* v. *Haston, supra,* 69 Cal.2d 233, 243; *People* v. *Cramer, supra,* 67 Cal.2d 126, 129; *People* v. *Kelley, supra,* 66 Cal.2d 232, 238; *People* v. *McCaughan, supra,* 49 Cal.2d 409,

---

tends to prevent confusion of issues, unfair surprise and undue prejudice." (Jackson, J., in *Michelson* v. *United States, supra,* 335 U.S. 469, 476 [93 L.Ed. 168, 174, 69 S.Ct. 213]. See also, *People* v. *Sykes, supra,* 44 Cal.2d 166, 174-175 (Traynor, J., dissenting); *People* v. *Baskett* (1965) 237 Cal.App.2d 712, 715-716 [47 Cal.Rptr. 274]; *People* v. *Lindsay* (1964) 227 Cal.App.2d 482, 503 [38 Cal.Rptr. 755].) Dean Wigmore explains the reasons for exclusion as follows: "It may almost be said that it is because of this indubitable Relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." (1 Wigmore, Evidence (3d ed. 1940) p. 646.)

[7]In addition, the exclusionary rule serves the subsidiary purposes of promoting judicial efficiency by restricting proof of extraneous crimes (*People* v. *Kelley, supra,* 66 Cal.2d 232, 238-239), avoiding the discouragement of reformation which would be caused by forever saddling an ex-felon with his criminal record (Note, *supra,* 78 Harv. L.Rev. 426, 436), and, in the case of other offenses for which the defendant had not been tried, providing fair notice and protecting the reasonable doubt standard of proof by preventing convictions based upon nothing more than the cumulative suspicion of a number of crimes. (*People* v. *Albertson, supra,* 23 Cal.2d 550, 579; *People* v. *Lisenba* (1939) 14 Cal.2d 403, 429-432 [94 P.2d 569].)

421; *People* v. *Sykes, supra,* 44 Cal.2d 166, 175 (Traynor, J., dissenting); *People* v. *Westek, supra,* 31 Cal.2d 469, 476; Evid. Code, § 352.) This balancing test is necessarily particularistic, depending not upon mechanically automatic rules, but upon the trial court's consideration of the unique facts and issues of each case according to the guidelines which we summarize below.

Admissibility depends "not merely on whether the evidence comes within certain categories which constitute exceptions to the rule of exclusion" (*State* v. *Goebel* (1950) 36 Wn.2d 367, 379 [218 P.2d 300]; see also *Adkins* v. *Brett* (1920) 184 Cal. 252, 255-256 [193 P. 251]) because most of the many kinds of traits common between offenses—*modus operandi,* peculiar behavior, victim, plan, scheme, design, time, and geographical proximity, for example,—may be used in different cases to prove one of any number of issues: identity, commission of an act, intent, knowledge, motive, premeditation, etc. (1 Wigmore, Evidence (3d ed. 1940) §§ 215-217, pp. 710-719.) "If both justice and predictability of decision are to be served, rigidity of tests of admission and exclusion, in our opinion, is not the answer. We believe that whenever the quarrel is between relevancy and the policy of the law to protect the accused against bias and prejudice likely to be engendered from the admission of relevant evidence, a balancing process must take place—a weighing of the probative value of the evidence offered against the harm it is likely to cause. When its probative value, addressed to the crime charged, is great to prove a vital issue as compared with the lesser likelihood that a jury will be led astray and convict an innocent man because of his bad record, the evidence should be admitted." (*People* v. *Sheets* (1967) 251 Cal.App.2d 759, 764-765 [59 Cal.Rptr. 777]; see also *People* v. *Sykes, supra,* 44 Cal.2d 166, 174-175 (Traynor, J., dissenting).)

Probative value and prejudice obviously are not commodities subject to quantitative measurement. Nonetheless, we may identify some of the guidelines which courts follow in performing the balancing process described generally above. The chief elements of probative value are relevance, materiality and necessity.[8]

[8]See *People* v. *Kelley, supra,* 66 Cal.2d 232, 238-239; *People* v. *Wade* (1959) 53 Cal.2d 322, 330-331 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Albertson, supra,* 23 Cal.2d 550, 576-578; *People* v. *Rosenfield* (1966) 243 Cal.App.2d 60, 67-68 [52 Cal.Rptr. 101]; Comment, *A Proposed Analytical Method for the Determination of the Admissibility of Evidence of Other Offenses in California* (1960) 7 U.C.L.A. L.Rev. 463, 465-468,

Before permitting the jury to hear evidence of other offenses the court must ascertain that the evidence (a) "tends logically, naturally and by reasonable inference" to prove the issue upon which it is offered;[9] (b) is offered upon an issue which will ultimately prove to be material to the People's case;[10] and (c) is not merely cumulative with respect to other evidence which the People may use to prove the same issue.[11] In determining relevance, the trial court must look behind the label describing the kind of similarity or relation between the other offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.[12] In order to assess materiality, the court must consider not merely the elements of the offense, but also the defendant's testimonial admissions.[13] Some commentators

---

480-482; Note, *supra*, 78 Harv. L.Rev. 426, 449-451. We use the term "probative value" in a sense broader than merely the weight or strength of the inference or logical connection. (*Compare* Comment (1961) 70 Yale L.J. 763, 771 *with* Wigmore, Principles of Judicial Proof (2d ed. 1931) ch. II.)

[9]*People* v. *Haston*, *supra*, 69 Cal.2d 233, 246; *People* v. *Kelley*, *supra*, 66 Cal.2d 232, 239; *People* v. *Pike*, *supra*, 58 Cal.2d 70, 89; *People* v. *Riser*. (1956) 47 Cal.2d 566, 578 [305 P.2d 1]; *People* v. *McMonigle* (1947) 29 Cal.2d 730, 742 [177 P.2d 745]; *People* v. *Peete* (1946) 28 Cal.2d 306, 315 [169 P.2d 924].

[10]See cases cited in footnote 9, *supra*. See also Comment, *supra*, 7 U.C.L.A. L.Rev. 463, 466, and authorities cited therein.

[11]*State* v. *Goebel*, *supra*, 36 Wn.2d 367, 379; Comment, *supra*, 7 U.C.L.A. L.Rev. 463, 481-482; see also Lacy, *Admissibility of Evidence of Other Crimes Not Charged in the Indictment* (1952) 31 Ore. L.Rev. 267. Contrast *People* v. *Dabb* (1948) 32 Cal.2d 491 [197 P.2d 1]; *People* v. *Westek*, *supra*, 31 Cal.2d 469.

[12]See *People* v. *McCaughan*, *supra*, 49 Cal.2d 409, 421-422; *People* v. *Sykes*, *supra*, 44 Cal.2d 166, 175-176 (Traynor, J., dissenting); *People* v. *Albertson*, *supra*, 23 Cal.2d 550, 577; *People* v. *Lane* (1893) 100 Cal. 379, 387-390 [34 P. 856]; Comment, *supra*, 7 U.C.L.A. L.Rev. 463, 483; Lacy, *op. cit. supra*, fn. 11, at pp. 281-286; Comment, *supra,*, 70 Yale L.J. 763, 770.

[13]*People* v. *Pike*, *supra*, 58 Cal.2d 70, 91; *People* v. *Riser*, *supra*, 47 Cal.2d 566, 578; *People* v. *Zerillo*, *supra*, 36 Cal.2d 222, 228; *People* v. *Teshara* (1904) 141 Cal. 633, 638 [75 P. 338]. The theory of admissibility of cross-examination in the cited cases was that defendant's testimony on direct examination constituted a "general denial" of a material element of the crime, thereby justifying cross-examination to "overcome any material fact sought to be proved by the defense." (*People* v. *Riser*, *supra*, at p. 578.) Conversely, a defendant's testimony which did not directly or impliedly contradict a material fact proved by the People could not provide the justification for the admission of other-offenses evidence on cross-examination, since such evidence would not tend to "overcome" any of defendant's direct testimony. (See Note, *supra*, Harv. L.Rev. 426, 440; Wall, *Judicial Admissions: Their Use in*

have suggested that if the People propose to introduce evidence of another offense in its case in chief, the court should permit the defendant to stipulate the truth of the issue which the People seek to prove.[14]

■ In the instant case, the prosecuting attorney stated the purposes of his inquiry into the details of defendant's prior robbery as follows: "to show common scheme, plan, or design; and most particularly, to show intent at the time of the offense charged." We conclude that the evidence could have been properly admitted as proof of a common *modus operandi* offered to show the fact of defendant's participation in the instant robbery; his knowledge of, and subsequent joinder in, a robbery initiated by his codefendant; and his awareness of apprehension by a police officer and hence his

---

*Criminal Trials* (1962) 53 J.Crim.L., C. & P.S. 15, 18-23 and cases cited therein; Comment, *supra*, 7 U.C.L.A. L.Rev. 463, 466. See generally, 9 Wigmore, Evidence (3d ed. 1940) §§ 2588-2597; Lacy, *op. cit. supra*, fn. 11, at p. 275. *Compare People* v. *Barnes* (1947) 30 Cal.2d 524 [183 P.2d 654, *with People* v. *Sindici* (1921) 54 Cal.App. 193, 196 [201 P. 975].

"The mere theory that a plea of not guilty puts everything material in issue is not enough for this purpose [of 'raising an issue' on which evidence of other offenses may be introduced]. The prosecution cannot credit the accused with fancy defences in order to rebut them at the outset with some damning piece of prejudice." (*Thompson* v. *The King* [1918] A.C. 221, 232; see also *State* v. *Gilligan* (1918) 92 Conn. 526, 532 [103 A. 649]; McCormick, Evidence (1954 ed.) § 157, p. 331.)

We point out below that while defendant's direct testimony did not constitute a "general denial" of *any* guilt involvement in the circumstances of the crime, as did that of defendant Ceniceros in *People* v. *Pike, supra*, 58 Cal.2d 70, his "general denial" of active participation in the robbery and intent to kill the police officer constituted material facts which the People were entitled to attempt to overcome on cross-examination. The rationale of *Pike* permitting cross-examination applies to the instant case.

[14]In *People* v. *Burkhart* (1931) 211 Cal. 726, 732 [297 P. 11], the court held that defendant's offer to stipulate the truth of some of the underlying facts did not render inadmissible the evidence of defendant's prior crimes only because defendant's stipulation was not broad enough to cover the crucial probative fact involved in the prior offense. One commentator criticizes some courts' refusal to permit the defendant "to stipulate some fact relevant to the offense charged in exchange for the exclusion of evidence of other crimes tending to prove that fact" as "a highly mechanical attitude toward the administration of these rules [governing admissibility of other-offenses evidence], automatically admitting all evidence that falls technically within one of the exceptions." (Note, *supra*, 78 Harv. L.Rev. 426, 439-440.) Another commentator discusses the element of necessity of other-offenses evidence as a balancing of "two complex variables—the relative certainty of other available proof on the issue and the degree of prejudicial impact of the other crimes evidence." He suggests that "Arguably a simpler approach . . . would be to require the defendant to concede the issue as a condition of barring the other crimes evidence offered in rebuttal." (Comment (1961) 70 Yale L.J. 763, 772 fn. 58.)

premeditation in committing the killing. It is immaterial that the court's ruling, at the time it was made, rested on an insufficient basis, since the prosecuting attorney did not explain, and the court did not inquire into, the nature of the similarity of the prior offense and the precise issue for which it was offered. It is also immaterial that the court erred in permitting the prosecutor to explain the purpose of the evidence within the hearing of the jury before ruling on its admissibility. "The evidence having been properly received against [the defendant], the ground of the court's ruling is immaterial." (*Wilcox* v. *Berry* (1948) 32 Cal.2d 189, 192 [195 P.2d 414].)

The cross-examination revealed that defendant had played the role of the active partner in a prior supermarket robbery committed with his uncle. The uncle, like defendant in the instant offense, remained unobtrusively in the general area of the checkstands, armed with a pistol, presumably prepared to assist the active partner in case of difficulty. The evidence thus presented the probative inference that (1) defendant had previously participated in a robbery, (2) he was aware of this method of committing robbery, and therefore, since (3) the instant offense was characterized by the same circumstances, either (4) his involvement in these circumstances was not innocent as he claimed, but that of an active accomplice, or (5) his previous experience caused him to know that a robbery was in progress and he joined in the commission of the crime, playing the role of "covering" that his uncle played previously. The evidence presented another probative inference: since at the time he left the supermarket his previous experience caused him to know that a robbery had been committed, he knew that when he was stopped in the parking lot he had been apprehended, and as a suspected accomplice he killed with deliberation and premeditation in order to effectuate his escape.

In impeaching defendant's testimony, the People could properly have adduced the fact that defendant had been convicted of a prior robbery. The prejudice caused by the additional inquiry into the details of the robbery was outweighed by its probative value. Defendant's testimony denying active participation in the robbery, and his assertion that the killing occurred accidentally, did not deprive the evidence of its materiality. The evidence was not merely cumulative of other proof on the same issues, but necessary to the People's case. We therefore conclude that the trial court properly admitted the cross-examination.

*3. Alleged improper admission of conditional sales contract obtained through unlawful interrogation*

 The record reveals that police learned of the conditional sales contract during the interrogation of defendant that we held violated his rights to counsel and to remain silent. (*People* v. *Schader, supra,* 62 Cal.2d 716, 727.).

 The fruits of an illegally conducted interrogation are no less inadmissible during the trial of the declarant than his statements themselves. Although they lack the element of potential unreliability inherent in the words of a confession, the physical byproducts of illegally obtained statements must be excluded for otherwise similar reasons. To protect the right of an accused " 'to remain silent unless he chooses to speak in the unfettered exercise of his own will[,]' . . . to maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' . . . to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth" (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 460 [16 L.Ed.2d 694, 715, 86 S.Ct. 1602, 10 A.L.R.3d 974]). The exclusionary rule is applied to the fruits as well as the words of an illegally obtained confession. A contrary rule would undermine the rights to counsel and to remain silent by providing police the simple expedient of conducting illegal interrogations for the purpose of obtaining physical evidence of guilt while foregoing the use at trial of the statements of the accused.

In *People* v. *Buchanan* (1966) 63 Cal.2d 880, 887 [48 Cal. Rptr. 733, 409 P.2d 957], we stated: "It is obvious that, since the gun was secured by police as a result of the statement obtained in violation of the rule of *People* v. *Dorado, supra,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], it too should have been excluded as the 'poisonous fruit' of the illegal statement. (Cf. *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 767-768 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 485 [83 S.Ct. 407, 9 L.Ed.2d 441]; *Nardone* v. *United States* (1939) 308 U.S. 338, 340-341 [60 S.Ct. 266, 84 L.Ed.2d 307].) This conclusion inevitably follows from the rule established in *Dorado.*" We also cited the statement of the New York Court of

Appeals that "under the circumstances, it is incumbent upon the District Attorney to show that the location of the guns was discovered through a source untainted by the admissions." (*People* v. *Robinson* (1963) 13 N.Y.2d 296, 301 [246 N.Y.S.2d 623, 196 N.E.2d 261].)

■■■ The prosecutor failed to show that the conditional sales contract and its contents were discovered "from an independent source" or that the discovery had "become so attenuated as to dissipate the taint." (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 487 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) The Attorney General only speculates that the registration on defendant's car "would show both a legal owner and an equitable owner," and that the police, therefore, *might* have been able to discover the contract if they had not learned of it through the interrogation. The purposes of *Dorado* and *Escobedo* preclude the eradication of the taint upon the illegally obtained sales contract on the basis of such sheer hypothesis.

We cannot hold, however, that defendant suffered prejudice from the error in permitting cross-examination upon the sales contract. Facing an overwhelming showing of his presence at the scene of the robbery and of his killing the police officer, defendant chose the defense that he had not participated in *the* robbery that actually occurred although he had planned to commit *a* robbery, and that his shooting of the police officer was accidental. In the context of such a defense, evidence which established that defendant harbored a motive to commit *a* robbery in order to meet a payment due on a conditional sales contract merely confirmed defendant's admission of the same fact; it added nothing to the People's case, nor did it detract from the defense. Beyond a reasonable doubt, the error did not contribute to the verdict on the guilt trial. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Modesto* (1967) 66 Cal.2d 695, 714 [59 Cal.Rptr. 124, 427 P.2d 788].)

4. *Alleged improper admission of articles seized from defendant's car*

■■■ Defendant attacks the trial court's admission into evidence of items seized from defendant's car four hours subsequent to his arrest, after a police officer had towed the car to the impound garage. The items included defendant's orange shirt, pearl buttons from the shirt, sunglasses, a cap, and makeup in a box. Defendant contends that because the evidence was seized at a time and place remote from the arrest, it

was not admissible as the product of a search incident to the arrest. He urges us to follow *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881], and *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67], in holding unlawful a vehicle search conducted at a police station hours after an arrest.

We need not decide, however, whether the evidence in the instant case had been obtained unlawfully, since it could not have prejudiced defendant's case; indeed defendant fails to suggest any source of prejudice. The items could only have tended to establish the truth of issues admitted by defendant, his identity as the culprit and his general intention to commit *a robbery*. Defendant admitted that he fired the fatal shot, and he testified that in planning the robbery they ''needed some objects that would help cover up our features'' and purchased caps, sunglasses, and makeup, and we do not believe that the prosecution's introduction into evidence of these items contributed to defendant's decision to adopt the position taken. (Cf. *People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].) His defense was that he did not participate in *the robbery that actually occurred* and that he fired the fatal shot accidentally. Upon these issues, the seized evidence had no bearing whatsoever. We conclude that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065] ; *People* v. *Modesto, supra,* 66 Cal.2d 695, 714.)

### 5. *Alleged erroneous admission of morgue photographs*

At the conclusion of the defendant's case the court admitted into evidence two colored morgue photographs for the purpose of establishing the trajectory of the bullet and the distance between the gun and the victim. We cannot accept defendant's contention that introduction of the photographs constituted prejudicial error.

In *People* v. *Schader, supra,* 62 Cal.2d 716, 733, we stated: ''The pictures showed a considerable amount of blood and were unpleasant to view, but they did have evidentiary value; the question whether such value outweighed any possible prejudicial effect rested within the sound discretion of the trial court. (*People* v. *Arguello* (1964) 61 Cal.2d 210, 213 [37 Cal.Rptr. 601, 390 P.2d 377] ; *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].) '' Although we are not automatically bound by our prior ruling, since the

instant trial was not a mere replay of the first trial (see *People* v. *Hillery* (1967) 65 Cal.2d 795, 803 [56 Cal.Rptr. 280. 423 P.2d 208]), we reach the same conclusion. In evaluating defendant's contention that the shooting occurred accidentally, the path of the bullet and the distance of the weapon from the victim's neck, in addition to expert medical testimony, constituted facts of some slight evidentiary value.

### 6. *Alleged errors in instructions*

 Defendant raises two contentions involving errors in instructions. He argues, first, that the court erred in failing to repeat instructions upon second degree murder and manslaughter when it twice complied with the request of the foreman to repeat instructions on conspiracy and first degree murder. Second, defendant contends that several of the original instructions were erroneous, superfluous and prejudicially repetitive. We find no merit in either point.

We find no error in the court's repetition of instructions requested by the jury. In each instance, the court read more than one-fourth of all of the original instructions. It instructed the jury fully not only upon those matters which it specifically requested but upon those matters implied from a hypothetical question posed by the foreman and necessary to the jury's comprehension of the applicable law. Although the court did not repeat its original instructions upon the elements of second degree murder and manslaughter, the jury indicated that it was concerned with the felony-murder theory and not with premeditated murder.

We cannot believe that the repeated instructions either confused the jury or subjected it to pressure from the judge. The court was scrupulously careful to disclaim any intention to learn of the content of the deliberations or to emphasize one instruction over another through repetition. The instructions were properly framed in a neutral manner, rather than with undue emphasis on affirmative constructions such as, "it is your duty to convict if" or, "defendant is guilty if." We know of no rule which requires the court to repeat all of its original instructions whenever the jury requests additional instructions upon a particular point. Such a procedure would not only be extraordinarily time-consuming and exhausting to the court, the jury, and the parties, but also would deter the jury from requesting, and the court from giving, additional instructions to elucidate a single issue.

 Defendant contends that the trial court erred in instructing the jury that it could consider evidence of the

prior robbery "for such bearing as it might have on the question whether the defendants are innocent or guilty of the crime charged against them in this action." The context of the instruction shows that the court properly limited the jury's consideration of the evidence: "Such evidence was received for a limited purpose only: *not to prove distinct offenses or continual criminality*, but for such bearing, *if any*, as it might have on the question whether the defendants are innocent or guilty of the crimes charged against them in this action. . . . The value, if any, of such evidence relating to the alleged commission of a robbery other than the robbery charged in the indictment depends on whether or not it tends to show that there existed in the mind of the defendant Harry Schader at the time of the robbery alleged in the indictment a plan, scheme, system or design, or that he entertained the intent which is a necessary element of the crime of robbery. . . ." (Italics added.) The balance of defendant's argument as to the impropriety of the instruction depends upon the inadmissibility of the evidence of the prior robbery, a contention which we rejected above.

Defendant raises the second contention that the court erred in including within its definition of second degree murder, "Two, when the circumstances attending the killing show an abandoned or malignant heart." Several months after the conclusion of the instant trial we explained in some detail why an instruction based upon this hoary mixed metaphor embodied in Penal Code section 188 is "unnecessary and undesirable." (*People* v. *Phillips* (1966) · 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].) While we disapproved its future use, we did not hold that its inclusion in instructions upon second degree murder constituted error. (*People* v. *Phillips, supra,* at p. 588.)

Third, defendant argues that the court repeated unnecessarily instructions upon murder of the first degree. We shall not attempt to report or summarize the instructions, but merely note our conclusion that in view of the multiplicity of theories advanced by the prosecution pertaining to first degree murder, the court's instructions were as succinct as possible. If the court had omitted any of the instructions tendered, defendant might have successfully argued on appeal that the court failed adequately to define the requirements necessary for a conviction of first degree murder.

Finally, we find no merit in defendant's contention that the court's instructions called unnecessary attention to the

fact that the victim was a police officer. The fact appeared but once in the original instructions, although it was included in the portions re-read upon the jury's request.

### 7. *Other contentions relating to the guilt trial*

Defendant raises a number of other contentions which lack merit. We shall deal briefly with each.

█ (a) *Sufficiency of the evidence.* Defendant contends that the evidence was insufficient, as a matter of law, to support a conviction of first degree murder. Yet the evidence sufficiently sustained the conviction upon any one of three theories: (i) that defendant killed Officer McKnight deliberately and with premeditation; (ii) that the killing occurred during the robbery in which defendant participated as an accomplice pursuant to a previously agreed-upon plan; and (iii) that defendant became an aider and abettor in the robbery after he became aware of its existence and killed the officer while effectuating his escape.

As to the first theory, eyewitnesses to the struggle between defendant and the victim testified that for several seconds before he fired the fatal shot defendant had succeeded in gaining the advantage against the officer by moving around behind him as defendant drew his pistol. Defendant testified that he cocked his pistol as he brought it up to the officer's neck. This evidence permitted the jury to infer that defendant formed the necessary premeditation during the moments of the struggle. (*People* v. *Quicke* (1964) 61 Cal.2d 155, 158 [37 Cal.Rptr. 617, 390 P.2d 393]; *People* v. *Cartier* (1960) 54 Cal.2d 300, 305-306 [5 Cal.Rptr. 573, 353 P.2d 53].)

As to the second and third theories, the employees of the market testified that defendant moved to within several feet of the area of the checkstands at the time codefendant Turner was perpetrating the robbery, and left a few seconds after Turner fled with the loot. Defendant had participated in a prior robbery with his uncle in which the uncle's role was to "cover" defendant in a manner similar to that of defendant in the instant offense. The jury might properly have inferred from such evidence either that defendant acted simply as an accomplice executing a common plan[15] or that he became an aider and abettor when he learned that the robbery was in

---

[15]Such a theory would, of course, be inconsistent with codefendant Turner's acquittal on the murder count. We need not, however, decide whether defendant Schader may raise a contention of inconsistent verdicts, since the evidence was sufficient to support the verdict upon other theories.

progress. Nothing compelled the jury to believe defendant's story that he learned of the perpetration of the robbery only after the killing, even in the absence of direct contradictory evidence.

(b) *Illegal arrest.* Defendant contends that his arrest was illegal, as based upon less than probable cause, and that all evidence obtained subsequent to the arrest should be suppressed as its "poisonous fruit." We upheld the legality of the arrest in *People* v. *Schader, supra,* 62 Cal.2d 716, 722-726, saying, "Under such circumstances as faced this officer, society must risk the arrest of suspects who are innocent rather than subject officers to needless hazards in effecting the arrest of suspected armed murderers." (*Id.* at p. 725.) We noted the pertinence of the view of Mr. Justice Jackson in his dissenting opinion in *Brinegar* v. *United States* (1949) 338 U.S. 160, 183 [93 L.Ed. 1879, 1894, 69 S.Ct. 1302], that standards of probable cause "should depend somewhat upon the gravity of the offense." Defendant contends that new evidence, adduced for the first time at the instant trial, showed that the arresting officer "arrested on suspicion only," and permits us to reexamine our earlier holding. (See *People* v. *Hillery, supra,* 65 Cal.2d 795, 803.) We do not find, however, that such "new evidence" falls without the rationale of our previous determination, and conclude once again that defendant's arrest was proper.

(c) *Discrimination in selection of jury panel*

We cannot accept defendant's contention that he suffered violation of his Sixth Amendment right to be tried by a jury of his peers in that the members of the jury panel came predominantly from "high social, economic and educational strata of society." Not only did defendant fail properly to raise the issue by objecting to the composition of the jury panel, but he does not show that the composition of the panel resulted from "intentional, systematic discrimination against persons of defendant's . . . economic status . . . ." (*People* v. *Carter* (1961) 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477].)

8. *Error affecting the penalty determination*

Defendant raises several contentions relating to the penalty phase. We conclude that the judgment as to penalty must be reversed because of errors of the type condemned in *Witherspoon* v. *Illinois, supra,* 391 U.S. 510.

We set forth in the footnote the relevant *voir dire* of Mrs.

Dawson.[16] We are unable to find that she made it "unmistakably clear (1) that [she] would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . . . or (2) that [her] attitude toward the death penalty would prevent [her] from making an impartial decision as to the defendant's guilt." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].) Mrs. Dawson merely stated that she was opposed to the death penalty and that her opinions on the death penalty would prejudice her.[17]

---

[16]"Q: [By the Court] You have an awareness by this time of what the case is about and the nature of the problem with which you'll be confronted. With that in mind, do you know of any reason why you couldn't serve on this case?

"A: Your Honor, I'm afraid I would be prejudiced. I have very strong opinions on the death penalty.

"Q: Are you opposed to the death penalty?

"A: I do.

"Q: That is a conscientious opinion?

"A: Quite conscientious. It's something that's very old.

"Q: Then, of course, under the law, the law sets up that as a qualification, you would not be permitted to serve in this case where that's possible.

"A: Yes."

The court then excused Mrs. Dawson.

[17]The argument is raised that the test in *People* v. *Varnum* (1969) 70 Cal.2d 480, 492 [75 Cal.Rptr. 161, 450 P.2d 553], compels us to review the questions asked the jurors previous to the examination of Mrs. Dawson and that "it is entirely reasonable to assume that when Mrs. Dawson stated she would be 'prejudiced' she was anticipating the court's test question" as to guilt, and did not have in mind the penalty trial. Yet even on its own premises this contention collapses.

The court stated to Mrs. Dawson: "You have an awareness by this time of what the case is about and the *nature of the problem* with which you'll be confronted." (Italics added.) The court then asked: "With that in mind do you know of any reason why you couldn't serve in this case?" In checking the transcript we note that although the court's questions as to other veniremen may have been directed toward the finding of guilt, counsel for the prosecution in examining the jurors carefully distinguished between the guilt and the penalty trials. Typically, in questioning one of the early veniremen, Grady Epps, Jr., counsel advised him that if the jury returned a verdict of first degree murder as to defendant it then "becomes involved in a penalty trial to determine whether or not the penalty shall be life or death, [and] then I will ask this jury on evidence that I anticipate to be presented to return the death penalty against this defendant." The prosecutor specifically asked the venireman if he "could . . . return a verdict by virtue of which you could condemn this man sitting here to death" in such penalty trial. The substance of this question was repeated to practically every venireman thereafter examined, constituting at least 28 in number.

When the court directed Mrs. Dawson to refer to the "nature of the problem" with which she would be confronted, and to "what the case is about" the court necessarily included the examination of all previous veniremen by both court and counsel. Indeed, in very many cases the court specifically stated to the previous venireman, "you have heard the various questions propounded by the court *and counsel* . . ." (italics

We cannot distinguish Mrs. Dawson's statements from those we held to be an erroneous basis for exclusion in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. ". . . . [A]t Saterfield's trial one prospective juror stated, 'I am opposed to the death penalty,' and was thereupon excused for cause; at Anderson's trial one prospective juror in response to the question 'Do you know of any reason you couldn't be a fair and impartial juror in this case?' replied, 'Yes, sir, I do. I don't believe in capital punishment' and was immediately excused for cause. In neither instance had the court made it clear to that particular prospective juror that opposition to the death penalty or conscientious scruples against that penalty would be insufficient by itself to disqualify such a juror from serving. . . .

"*Witherspoon* held 'that a sentence of death can not be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' " (*In re Anderson, supra,* 69 Cal.2d at pp. 617-618.)

The trial court therefore committed error in excusing Mrs. Dawson, and this error requires reversal. (*In re Anderson, supra,* 69 Cal.2d 613, 619-620.) Accordingly we need not consider defendant's allegations of further errors of the type condemned by *Witherspoon* v. *Illinois, supra,* 391 U.S. 510.

Defendant urges additional claims of error regarding the penalty phase. Some of his contentions a majority of this court has recently rejected in *In re Anderson, supra,* 69 Cal.2d 613; others may not arise at the penalty retrial. ▮ For guidance of the court, however, we consider defendant's contention that evidence of his commission of nine other robberies, for which he was never tried, introduced

added) (see, for example, the examination of Jack Wulff). As a result, when Mrs. Dawson answered the court's question and stated that she had "very strong opinions on the death penalty" we cannot tell whether she referred to her attitude as to the penalty or the guilt trial. In light of the prior questioning of the veniremen, her answer could have referred to either trial. Indeed, the questions asked of the two veniremen immediately prior to Mrs. Dawson (Ladd and Grimm) did not even include the so-called "test question" of the court as to whether the venireman would be prejudiced as to the guilt trial. Thus the likelihood that Mrs. Dawson had in mind the guilt trial is all the more remote. In any event, her answer surely does not make it "unmistakably clear that [she] would automatically vote against the imposition of capital punishment" in the penalty trial. (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770]; see *People* v. *Osuna* (1969) 70 Cal.2d 759, 768-769 [76 Cal.Rptr. 462, 452 P.2d 678].)

at the penalty phase, was inherently 'unfair and prejudicial, in that the offenses were not described with sufficient particularity as to time and place, proof of all of their elements was incomplete, and the court failed properly to instruct the jury upon the standard of proof required for its consideration of the other robberies. The court instructed the jury as follows: "You are instructed that you may not consider such evidence in respect to any alleged crime or offense in aggravation of the penalty, unless the commission of the offense was proven beyond a reasonable doubt. The defendant is presumed innocent of those crimes. The effect of this presumption is to place upon the State the burden of proving him guilty thereof beyond a reasonable doubt." The instruction was proper and would have protected defendant against any deficiency in the People's proof of the other offenses. (*People* v. *Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Terry* (1964) 61 Cal.2d 137, 149, fn. 8 [37 Cal.Rptr. 605, 390 P.2d 381].)

██ Defendant also contends that the evidence of six of the nine prior robberies should have been excluded because it was obtained as the fruit of an improper interrogation preceding defendant's 1957 robbery conviction. The record before us fails to support this contention, and since defendant failed to object to the admission of the evidence at trial he may not now urge its inadmissibility.

The judgment imposing the death penalty is reversed insofar as it relates to the penalty. In all other respects the judgment is affirmed.

Traynor, C. J., Peters, J., and Sullivan, J., concurred.

BURKE, J., Concurring and Dissenting.—

I dissent. In our application of the rule announced in *Witherspoon* (*Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) this court noted in its decision in *People* v. *Varnum*, 70 Cal.2d 480, 492-493 [75 Cal. Rptr. 161, 450 P.2d 553]: "Our task requires us to assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place. The

*voir dire* examination of a juror individually is not conducted in a vacuum; it is but a part of a broader process directed to an entire group of men and women designed to effectuate the selection of fair and impartial jurors. Before his name is drawn, the individual venireman is in attendance in the body of the courtroom, an involved subject of this process, addressed collectively with the other members of the panel by the judge, and, along with them,. observing and aware of the individual examination of the veniremen whose names are first drawn. In short, in our probing of the juror's state of mind, we cannot fasten our attention upon a particular word or phrase to the exclusion of the entire context of the examina-. tion and the full setting in which it was conducted.''

Applying *Varnum* to the instant case, a review of the *voir dire* examination indicates that at the very outset the court instructed the panel that in the penalty phase the decision as to whether the defendant (if found guilty) should suffer death or life imprisonment ''is within the discretion of the jury.'' He further explained in questioning one of the first jurors that he was not suggesting that ''this is a proper case; that would be for the jury to determine, if we get that far.''

The court stated. the test with respect to conscientious objections or opinions concerning the death penalty as follows: ''Do you have any such conscientious scruples against the imposition of the death penalty as would preclude you from returning a *verdict of guilty* in a proper case?'' (Italics added.) The court reiterated this test on over 40 occasions.

Thus, it is clear from a review of the entire record that each prospective juror was made aware that the court was seeking to ascertain whether any conscientious scruples which any such juror might have were such as to preclude such juror from returning *a verdict of guilty*.

Under *Witherspoon, supra,* and this court's decision in *In re Anderson,* 69 Cal.2d 613, 617 [73 Cal.Rptr. 21, 447 P.2d 117], it was entirely proper to excuse jurors for cause whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*. In *People* v. *Fain,* 70 Cal.2d 588, 601 [75 Cal.Rptr. 633, 451 P.2d 65], this court held that a juror whose views would preclude her from returning a first degree murder *conviction* was properly excused for cause. On the other hand, in *Fain,* we held that a juror who said it would be difficult for her to vote for the death *penalty* was improperly excused because as in *Witherspoon* it cannot be assumed that such juror ''could

never vote in favor of it or that he would not consider doing so in the case before him.'' (*Id.* at pp. 515-516, fn. 9.)

Thus, in *Fain* we noted the distinction between the effect of a juror's conscientious scruples with respect to capital punishment upon his ability to vote to impose the death *penalty* itself as distinguished from his ability to act impartially in the determination of defendant's *guilt*.

These two types of prejudice and the different standards to be applied to them were clearly defined in *Witherspoon, supra,* pp. 522-523, footnote 21, and reiterated by this court in *Anderson, supra,* p. 617. They are quoted again in the majority opinion in the instant case, but, I submit, are not followed. Under those standards the prospective juror must make it ''unmistakably clear (1) that [she] would automatically vote against the *imposition of capital punishment* without regard to any evidence that might be developed at the trial . . . or (2) that [her] attitude toward the death penalty would prevent [her] from making an impartial decision as to the defendant's *guilt.*'' (Italics added; *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].)

In the instant case, as has been noted, the judge's test question, which he continued to repeat time and time again, came under the second category dealing with the effect of a juror's attitude upon his ability to make an impartial decision as to defendant's *guilt* and not under the first category dealing with his ability to vote for the death *penalty* itself.

The first juror asserted to have been improperly excused was Mrs. Ragsdale. At least 12 veniremen had been examined by the court before she was questioned and each one of the 12 had been asked the test question referred to above. There were some minor variations in the exact language used but no change whatever in substance; each pertained specifically to the effect of conscientious scruples upon the juror's ability to return a verdict of *guilt* (and not with *imposing* the death penalty itself).

Mrs. Ragsdale was asked if she heard the judge's statement of the case and the questions propounded by the court and counsel and nodded affirmatively. She was then asked the test question, albeit phrased in a slightly different manner. The questions and answers were as follows:

''THE COURT: Do you have some conscientious scruples as would prevent you from returning a verdict of guilty in a case wherein the death penalty might be imposed?

"A. Well, your Honor, I don't feel like I should sit on the case.

"THE COURT: Do you have an opinion at this time, Mrs. Ragsdale? I don't want you to tell me what the opinion is. I want to know if you have one?

"A. Yes, I do have an opinion, sir.

"Q. And you feel that opinion is such it would take evidence to remove it?

"A. Yes, sir.

"THE COURT: Any objection to excusing this juror?

"MR. DAVIS: No, your Honor.

"MR. PUGLIA: No.

"MR. WELLS: No."

In essence what this juror said was that she had conscientious scruples, she phrased it "an opinion," which would prevent her from returning a verdict of guilty, an opinion which would take evidence to remove. Whether her "opinion" favored the defense or prosecution we do not know but clearly this juror was not *impartial* on the issue of guilt and was properly excused.

Juror Ross was about the 18th in the list of jurors examined and thus he had heard the court repeat the test question at least 17 times before he was questioned. He was asked:

"Q. Do you know of any reason from what you have heard here today why you couldn't give to both sides and to all parties a fair, impartial trial?

"A. Yes, I have some very strong feelings in regard to the capital punishment law.

"Q. Are you telling the Court at this time that you have some conscientious scruples which might preclude you from returning a verdict of guilty where—

"A. I do, your Honor. Yes.

"THE COURT: Well, then, you'll be excused, sir. Thank you."

I submit he was properly excused for cause.

By the time juror Dawson was examined she had heard the court ask the test question, stressing ability to determine *guilt*, over 30 times. Also, in the questioning of almost every prospective juror who preceded her, at least 40 by actual count, either the court or counsel would ask whether the juror had heard all of the questions that had been asked of the other jurors. After certain identification questions, Mrs. Dawson's examination proceeded along the same line:

"Q. You have an awareness by this time of what the case is

about and the nature of the problems with which you'll be confronted. With that in mind, do you know of any reason why you couldn't serve on this case?

"A. Your Honor, I'm afraid I would be prejudiced. I have very strong opinions on the death penalty.

"Q. Are you opposed to the death penalty?

"A. I do.

"Q. That is a conscientious opinion?

"A. Quite conscientious. It's something that's very old.

"Q. Then, of course, under the law, the law sets up that as a qualification, you would not be permitted to serve in this case where that's possible.

"A. Yes.

"THE COURT: Again, ladies and gentlemen, this Court is not suggesting that that is the proper disposition. I'm merely stating a legal principle with which you are confronted on this issue. So you will be excused.

"MRS. DAWSON: Thank you, sir."

I believe that it is entirely reasonable to assume that when Mrs. Dawson stated she would be "prejudiced" she was anticipating the court's test question which, in the normal sequence which he had employed, followed immediately after his general question as to whether the juror knew of any reason why he couldn't serve in the case.

In fact, in more than a dozen instances the identical sequence was followed. Referring back to the examination of juror Ross it is to be noted the court asked the questions in the identical sequence and that Ross anticipated the question to follow just as I am asserting it is reasonable to assume juror Dawson did.

A juror who volunteers that she "would be prejudiced" because of her "strong opinions on the death penalty" was properly determined by the trial judge to be one whose "attitude toward the death penalty would prevent [her] from making an *impartial* decision as to defendant's guilt." (Italics added; *Witherspoon, supra.*)

Mr. Slaff was the last of the panel to be excused for cause relating to the *Witherspoon* issue:

"Q. You know of any reason, sir, why you couldn't sit on this particular jury to give to both sides a fair trial?

"A. Well, sir, I have fixed feelings about capital punishment.

"Q. Do I understand that when you say that, you are opposed to the imposition of the death penalty?

"A. Yes, sir.

"Q. Would that opinion which you hold, as you sit there today, preclude you from returning a verdict of guilty in a case?

"A. Yes, sir.

"THE COURT: Under those circumstances, sir, you may not serve. So you will be excused. That's all."

Here, again, he was properly excused under the second category of prejudices relating to *guilt*.

The majority assert that they cannot distinguish the answers of venireman Dawson from those which we held in the *Anderson-Saterfield* cases, 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], as compelling a reversal. The distinction, however, is readily apparent. In the *Anderson-Saterfield* cases, unlike the instant case, the trial court did not use the test question utilized by the judge in the instant case. In *Saterfield*, the companion case to *Anderson, supra,* 69 Cal.2d 613, the emphasis of the court's questioning in the very few instances where he referred to the death penalty at all was on the imposition of the death penalty itself and not on the bearing of any prejudice on the question of guilt:

"THE COURT: One other question that the Court might put to you people; in all probability the People in this matter will be seeking the death penalty. Now, are there any of you with objections, conscientious or otherwise, that would cause you to be biased for or against such a request.

"Do any of you have, any of you already have a pre-conceived notion this is something you couldn't deliberate on with a fair and impartial mind?

"Are there any of you that feel that way?"

Likewise counsel in their *voir dire* examinations in both *Anderson* and *Saterfield, supra,* asked the jurors if they tended to prefer one penalty over the other, or had any initial feelings as to which is the more appropriate. In addition in many instances counsel asked if the prospective juror could vote for the death penalty for first degree murder in a proper case. In *Anderson, supra,* the trial court did not ask the prospective jurors specifically with reference to their views on capital punishment. After asking identifying and other preliminary questions of each juror he would ask: "Do you know of any reason you couldn't be a fair and impartial juror in this case?" If the juror responded in the negative the court then permitted counsel to inquire. If the juror indicated that he had certain beliefs concerning the death penalty which

would prevent him from serving or that his opposition to the death penalty would not permit him to be fair and impartial, he was thereupon excused with no further questioning.

This was in no way comparable to the format utilized in the instant case.

Finding no error under the application of *Witherspoon* I dissent from the reversal of penalty. I concur in the affirmance of guilt.

McComb, J., and Schauer, J.,* concurred.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.