[Crim. No. 5329. Second Dist., Div. One. May 31, 1955.]

THE PEOPLE, Respondent, v. ALFRED MUSUMECI, Appellant.

Albert C. S. Ramsey for Appellant.

Edmund G. Brown, Attorney General, and Jay L. Shavelson, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused of violating section 288 of the Penal Code in that he committed

a lewd and lascivious act upon the body and private parts of a child 13 years of age, with the intent of arousing and gratifying the sexual desires of himself and the child.

Following the entry of a plea of not guilty, the cause proceeded to trial before a jury which returned a verdict of guilty as charged in the information.

By stipulation the issue of sexual psychopathy was submitted on doctors' reports, and the court found defendant to be a probable sexual psychopath and ordered him committed to the Department of Mental Hygiene for a period not to exceed 90 days for placement at the Metropolitan State Hospital. Said hospital having reported that defendant was a sexual psychopath capable of benefiting from treatment at a state mental institution, the court found him to be a sexual psychopath and committed him to the Department of Mental Hygiene for placement at the Atascadero State Hospital for an indeterminate period.

Motion for a new trial was denied, and from the order of denial thereof, defendant prosecutes this appeal.

The factual background surrounding this prosecution as reflected by the record discloses that the victim of defendant's alleged misconduct was his stepdaughter, who was living with her mother and defendant. The prosecutrix testified that one day in June, 1953, defendant was called home from the restaurant operated by himself and his wife to fix a faucet. That after repairing the faucet, and after the departure of a neighbor, defendant asked the witness to kiss him. She refused, but the defendant, nevertheless, did kiss her, then asked her forgiveness and left the house. That about a week later, while she was lounging on the couch watching television, defendant was sitting in a rocking chair in the same room. The latter's wife was asleep in the adjoining bedroom. Defendant asked the witness, who was dressed in play shorts and sweater, whether he could kiss her legs. She said "No" and walked away.

About a week thereafter the witness was again watching television with defendant when the incident alleged in the information occurred. Concerning this occasion, the prosecutrix testified:

". . . Al (defendant), he asked me, he said, can I kiss your legs and I said, No, sir, and he says, Why. I didn't say nothing. He got up from the rocking chair and he came over and kissed them. Then after he kissed them I tried to get away from him. He kept on moving up towards

the center of my legs." That defendant was kneeling down, with his knees on the floor; that he spread her legs apart, raised up her play shorts and "put his mouth on my private parts." That while this act was taking place, defendant's wife, mother of the victim, opened the door leading into the bedroom. That thereupon, defendant "moved back, real quick, back to his chair where he was seated before." When asked whether her mother said anything the witness replied, "She said, can't you guys turn the television down lower, and I got up and I turned it down lower, and then I went to the bathroom."

The prosecuting witness further testified that on a subsequent occasion defendant told her he wished to show her the things an employee named Bob did to boys. The witness stated that she was not interested and told defendant to let her alone.

Defendant later came to her bedroom on two occasions. The first time, he stated he was sorry for what he had done, and asked her forgiveness. The second time, he asked her to "give in to me." She said "No" and asked defendant to let her alone. That defendant then said, ". . . I don't know why I do these things. Some guys cannot have control over theirselves. I don't know why I do these things. I hope you'll be forgiving of me, . . . ."

On another occasion, defendant asked the prosecutrix to take off her shorts and she refused.

At other times, defendant kissed her on the lips and about the neck.

That while she was ironing or working around the house, defendant on several occasions would touch her private parts or any part of her body he could reach. That defendant would say, "Excuse me. Pardon me."

When the prosecutrix made complaint to the police she telephoned defendant from the police station. A police officer who listened in on this conversation testified as follows:

"A. I heard Anita talking to some one on the other end of the line, and I heard her say, 'No, I don't want to go home after what you did to me.' Then later I listened to part of the conversation and I heard the defendant say, 'have you told anybody about it yet,' and Anita answered, 'No,' and then the defendant said, 'if you'll forget it, I'll forget it.'"

Another police officer testified as follows:

"A. I asked the defendant if he touched Anita in any way, and he said, on two occasions. On one occasion he had

a little too much to drink and kissed the victim on the lips in the kitchen. On another occasion he said he boosted her up to a light fixture to put the bulb in, and when he let her down his hand accidentally slid up between her legs, and touched her private parts.''

Defendant also told police he had been addicted to abnormal sex practices over a period of years and that he had been to a doctor for treatment, but had not been helped.

Defendant also told another police officer that he had had a sex problem for approximately 30 years and had been to a doctor about it.

On cross-examination, the complainant testified that prior to the time she became 12 years old, defendant would give her good night kisses in the presence of her mother, on the limbs, nose, forehead ''or something like that.'' The first kiss on her lips occurred after she was 12 and while they were alone in the house.

She testified she was afraid of her stepfather. That about a year ago their home had burned down, due to an accident on her part, and she became suspicious of him and others who had questioned her regarding this.

She also admitted that she waited eight months before she told anyone about defendant's claimed misconduct with her. She assigned as reasons for this long delay a woman by the name of Aileen Castellon who worked at the café, had frequently ''baby sat'' with her. Aileen and her stepfather had had an argument about the operation of the café. Anita had telephoned her mother for permission to go out during the evening and her mother had refused permission. The girl felt that she never was permitted to go out any place and thought she was abused. She thereupon became angry at her mother and decided to tell Aileen what her stepfather had done.

The prosecutrix admitted that just prior to the time she told her friend Aileen of defendant's purported conduct she had been advised that she was going to be sent away to school at San Marina Hall, but claimed she was ''pretty happy'' about going to the school.

When shown a letter she had written to a girl friend Shirley, the prosecutrix first declared the letter was not in her handwriting. Finally admitting that the signature, if not the body of the letter, was in her handwriting, the prosecutrix testified that she had written a letter but had destroyed it. That this letter contained the statement that

her stepfather had given her liquor which was untrue, as was the statement about his permitting her to have "weeds." While denying certain derogatory and vile statements contained in the letter regarding her mother, the witness admitted that she hated her mother and had written the statements in anger. Then, notwithstanding her vigorous denials of writing the aforesaid letter, the complainant suddenly admitted she did. She stated that the letter and the charges therein contained were "a bunch of lies." The witness also admitted that her statement to the officers that the defendant had exposed himself and his private parts to her was false. She admitted that she told an untruth when she complained to her mother that her uncle had attempted to attack her and was equally untruthful when she reported to the police that some sailors were "trying to get in at her" at the duplex where she was living in Long Beach.

When asked, "You didn't stop to think whether you are lying or telling the truth to this jury, have you?" the prosecutrix replied, "Well, sir, I guess not."

As a witness in his own behalf, defendant testified that he at no time touched the prosecutrix with any lustful or lascivious intent. He stated that on the occasion he had come home to fix the faucet he had merely accomplished the task, watched television and returned to his place of business. He testified that he had spanked Anita several times and on one occasion had felt remorseful for having done so and had grabbed her and kissed her, seeking forgiveness.

Defendant testified that once when Anita was working in the kitchen, he had put his arms about her and told her he was sorry for hitting her. That he had never kissed Anita on the legs or asked her permission to do so. He denied having put his hands under Anita's shorts or having pushed aside her underpants or putting his face on her private parts. He denied having asked her to let him show her what "Bob did to boys" and denied having asked her "to give in" to him or engage in any sexual act. He testified that Anita was angry with him after the whippings and that there was dissension in the home relating to Anita's going away to school. He stated that he had told his wife, in Anita's presence, to "smack" Anita across the mouth whenever she "talked back" to her. Defendant stated that he had reprimanded Anita about smoking and going out with boys.

He testified that he had once boosted Anita up to repair a light fixture and that she had slipped and he had acci-

dentally touched her privates in attempting to break her fall.

Defendant stated that when Anita called him from the police station and he apologized to her and asked her whether she had told anyone ''about it,'' he had been referring to the whippings and not to any act of a sexual nature.

Defendant testified that he had quarreled with a female business associate named Aileen and that Anita had admitted in his presence that she had been induced by Aileen to make the accusations in the instant case.

On cross-examination defendant was interrogated concerning his aforesaid conversations with police officers concerning his ''sex problem,'' following which interrogation the district attorney asked defendant, ''You are a sex pervert, aren't you?'' An objection was interposed when the following transpired:

''THE COURT: Objection over-ruled. You may answer if you understand it.

''A. (The Witness): What do you mean on that?

''Q. Your particular form of sex perversion is putting your mouth——

''MR. RAMSEY (Defendant's attorney): Just a minute——

''MR. COCHRAN (Deputy District Attorney): May I finish the question?

''MR. RAMSEY: I know what the question is going to be. I would like to be heard before the question is asked.

''MR. COCHRAN: He asked me what I meant by a sex pervert.

''THE WITNESS: I know what a sex pervert means, but what type of sex pervert are you talking about?

''MR. COCHRAN: That's what I want you to explain, to tell you in my question.''

Following a colloquy between court and counsel, defendant's objection was again overruled, and the following ensued:

''MR. COCHRAN: I will ask you this question squarely, Mr. Musumeci, is it not a fact that your particular type of sex perversion is the desire on your part, that you have not been able to overcome, to put your mouth on the sexual organs of a female person?''

Defendant's counsel interposed a further objection, the jury was excused, and the court heard argument, terminating with the declaration of the district attorney, ''We have a right to elicit from him that he has a predilection for the sex perversion of putting his mouth to the female private

parts. . . . We are entitled to prove anything that will discredit the testimony of the defendant or minimize it, and it is relevant and it is admissible. The fact it is prejudicial is beside the point "

Upon return of the jury, the record reveals the following:

"THE COURT: Objection over-ruled. The witness is instructed to answer the question.

"THE WITNESS: Will you read that again?

" (Question re-read.)

"A. Want me to answer that?

"THE COURT: Yes. A. Yes."

Defendant's wife testified that on the day that the act alleged in the information was committed, she had been resting in her bedroom and that when she came to the living room, the door was not closed as Anita had testified, and that she, defendant's wife, had turned off the television and not Anita. She further testified that when she entered the room Anita and her stepfather were sitting in different places.

In urging a reversal of the order denying his motion for a new trial, appellant relies upon the general rule that where an accused is charged with a specific offense, evidence of other offenses is inadmissible either as tending to show a disposition on the part of the accused to commit such offenses or as corroborative of the testimony directed to the proof of the specific offense for which he is on trial.

While it is true that evidence in a criminal case is admissible when it tends logically, naturally, and by reasonable inference to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, or whether it be part of a single design or not, nevertheless, such extraneous proof is never admissible when it shows merely criminal disposition. ▆ Proof of other crimes cannot be shown to establish the depravity of an accused or his criminal propensities or the resultant likelihood or predisposition to commit the crime charged.

▆ That such was the purpose of the challenged questions herein is evidenced by the following instruction given by the court to the jury:

"The People have elicited testimony in this case concerning the character of the defendant and his sexual characteristics. *Such evidence was offered and admitted solely to prove a criminal disposition or propensity on the part of the defend-*

ant to have committed the act charged in the complaint. In other words, the evidence that the defendant is a sexual deviant was placed before you for the purpose of your consideration of whether or not a person of such nature and habits would have been more likely than some other person to have done the act charged in this complaint." (Emphasis added.)

The conclusion is inescapable that the challenged testimony was placed before the jury for the sole purpose of leading them to believe that it was more probable that the defendant was guilty of the crime charged in the information because he was possessed of a sexual problem. That therefore, appellant was the sort of person who would be inclined and willing to commit the criminal act charged against him. In fact, by the foregoing instruction, the jury was so admonished.

Whatever may be the exceptions to the general rule, it is firmly established in our law that testimony tending only to prove inclination of an accused toward crime, thereby rendering more probable his guilt of the charge for which he is on trial is inadmissible (*People* v. *Albertson,* 23 Cal.2d 550, 576, 577 [145 P.2d 7]).

Respondent contends that the questioned testimony was admissible to corroborate portions of the testimony of the prosecutrix and to show the intent with which certain collateral acts were committed. However, this argument loses force when recourse is had to the above-quoted instructions wherein the jury was unequivocally advised that they were to consider such evidence only to arrive at a determination of "whether or not a person of such nature and habits would have been more likely than some other person to have done the act charged in this complaint." The case of *People* v. *Peete,* 28 Cal.2d 306, 314, 315 [169 P.2d 924], strongly relied upon by respondent, specifically states that such evidence may under certain conditions be admissible, but never "when it shows merely criminal disposition. . . ."

Respondent however contends that the aforesaid instruction was submitted by appellant, and that he should not now be heard to complain of error committed by the trial court where he himself invited such error. It is true that the general rule is that when an instruction is given at the request of an accused he cannot find fault with the court for complying with his request. (*People* v. *Curtis,* 36 Cal.App.2d 306, 321 [98 P.2d 228]; *People* v. *Bartol,* 24

Cal.App. 659, 664 [142 P. 510].) However, under the circumstances here present, we are not disposed to invoke the rule. When the admission of the questioned testimony was under consideration by the court, the district attorney, in urging its admissibility, said, "We have a right to elicit from him that he has a predilection for the sex perversion of putting his mouth to the female private parts . . . We are entitled to prove anything that will discredit the testimony of the defendant or minimize it, and it is relevant and admissible. The fact that it is prejudicial is beside the point." Since it was error to admit the evidence in the first place, and since the prosecution offered no instruction limiting the scope of the jury's right to consider it for all purposes affecting the guilt of appellant of the charge preferred against him, appellant's counsel undoubtedly seeking to minimize the prejudicial effect of such evidence, offered the instruction in question. That the trial judge gave mature consideration to the instruction is evidenced by the fact that in his own handwriting he changed the language thereof. We perceive no wilful intent to mislead the court and in our opinion, the court regarded it as a correct statement of the law and the reasons for admitting the testimony here complained of.

As stated by respondent, the act alleged in the information was such that guilty intent is obviously and conclusively inferable from the very commission of the act; thus there can be no issue as to intent, but only as to whether the act was actually committed by appellant upon the person of the prosecutrix.

As heretofore pointed out, the vice of admitting the testimony concerning appellant's predilection for sex perversion, lies in the fact that the jury was permitted to consider it in determining "whether or not a person of such nature and habits would have been more likely than some other person to have done *the act charged in this complaint.*" (Emphasis added.)

Respondent admits that, "It may be conceded that if the People's case rested solely on the credibility of the prosecutrix, any substantial error committed by the Trial Court is likely to have been prejudicial because her credibility was seriously shaken on cross-examination." Indeed, the prosecutrix was thoroughly impeached on cross-examination. She made no complaint against appellant until more than eight months after the occurrence and then, only on the eve of her being sent away to a school against her will.

Although her mother came into the room at the time she testified the act charged in the information was committed she made no mention of the occurrence. ■ Courts look with disfavor upon a complaint made long after the event in question. (*People* v. *Vaughan,* 131 Cal.App. 265, 268, 269, 271 [21 P.2d 438]; *People* v. *Lambert,* 120 Cal. 170, 173, 174 [52 P. 307]; *People* v. *Corey,* 8 Cal.App. 720, 724 [97 P. 907].) ■ She admitted to falsely accusing other men, including her uncle, of sexual misconduct toward her. These and other phases of the testimony of the prosecutrix greatly weakened the probative value of her accusation. We do not refer to these matters for the purpose of arriving at a conclusion that the story of the prosecutrix as to the offense charged ought not to be believed by the jury, but for the purpose of emphasizing the duty imposed upon us to carefully scrutinize the claimed errors appearing in the record. ■ "Whether guilty or innocent, the appellant was entitled to have his case fairly tried according to the established rules of law, and as said by a learned judge, 'Though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust and dangerous to the whole community.' (*Hurd* v. *People,* 25 Mich. 405.) The doctrine that respect for the law cannot be inspired by withholding the protection of the law is one which recognizes no exceptions." (*People* v. *Braun,* 31 Cal. App.2d 593, 603 [88 P.2d 728].)

Respondent insists that the evidence complained of was not prejudicial because the jury had already been informed through the testimony of police officers that appellant had told them that "he had had a sex problem for approximately thirty years." Respondent urges that appellant did not object to the introduction of such testimony, but the record reflects that when the first officer testified an objection was interposed and overruled. Manifestly an objection to the testimony in that regard by the second officer would be pointless. And, if such testimony was offered as a prelude to the introduction of the later damaging and prejudicial evidence then it too was inadmissible. It bore no relevancy to the charge for which appellant was on trial. In the conversations related earlier in the trial by the officers there was neither an admission or confession of wrongdoing.

The real question presented here is, *Has the accused had a fair trial?* In reviewing the overall picture painted by the evidentiary features of this case and the rulings of the court,

it seems clear to us that if the jury attached the slightest weight to the highly prejudicial and incompetent evidence heretofore adverted to, it would be sufficient to turn the scales. As was said by the Supreme Court in the recent case of *People* v. *Cahan*, 44 Cal.2d 434, 446, 447 [282 P.2d 905], "Thus, no matter how guilty a defendant might be or how outrageous his crime, he must not be deprived of a fair trial, and any action, official or otherwise, that would have that effect would not be tolerated."

That the questioned testimony was highly prejudicial there can be little doubt. To entertain a contrary view is to ignore human experience, the propensities and passions of people, the course of nature, and common sense. We cannot agree that the saving grace of section 4½, article VI, of the state Constitution should come to the rescue of this conviction. ██ As was stated by this court in *People* v. *Gilliland*, 39 Cal.App.2d 250, 264, 265 [103 P.2d 179] :

"We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis*, 210 Cal. 540, 556 [293 P. 32].) ██ The phrase 'miscarriage of justice' as used in the constitutional provision has no hard or fast definition, and as was said in *People* v. *Wilson*, 23 Cal.App. 513 [138 P. 971], 'does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. "It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected.' "

"If a defendant cannot be fairly convicted, he should not be convicted at all; to hold otherwise would be to provide ways and means for the conviction of the innocent. It cannot be gainsaid that you cannot inspire or preserve respect for the law by withholding its protection from those accused of crime. While deviation from the prescribed rules of law

governing trial may result in justice for the particular defendant who is before the bar, it is dangerous to the community and its citizens. As was said by Chief Justice Hughes of the United States Supreme Court not so long ago, 'In our system, the individual finds security in his rights because he is entitled to the protection of tribunals that represent the capacity of the community for impartial judgment as free as possible from the passion of the moment and the demands of interest or privilege.' When, as here, we are unable to say 'whether appellants would or would not have been convicted, but for the errors of the court, we must direct a reversal.' (*People* v. *Degnen,* 70 Cal.App. 567 [234 P. 129].)''

In *Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527] it was held that when a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law.

We feel justified in again calling attention to the remarks of the court in *People* v. *Black,* 73 Cal.App. 13, 43 [238 P. 374], as follows:

''. . . we feel impelled to direct the attention of district attorneys and trial judges to the frequent occasion which is thrust upon us to save judgments of conviction by means of the provisions of section 4½ of article VI of the constitution. It seems evident that the prosecutors of the state, and possibl[y] that the trial judges, are conducting criminal cases with an eye to the saving grace of the section. It should be manifest that such a course is improper. In the performance of their respective duties incident to trials, the existence of the section is of no concern to those officers. That part of the organic law of the state is of interest, so far as its application is concerned, if we except proceedings on motion for a new trial (see *People* v. *Tomsky,* 20 Cal.App. 672 [130 P. 184]), only to the courts of review. District attorneys and trial judges should conduct the trial of criminal cases exactly as if the section did not exist. Such a course, if faithfully and diligently pursued, will lessen the number of appeals, will shorten the time necessary for the consideration of appeals which are taken, will lessen the number of retrials by superior courts, and will conduce to the general dispatch of business in both trial and appellate courts.''

The order denying defendant's motion for a new trial is reversed and the cause remanded for a new trial.

Doran, J., and Drapeau, J., concurred.