[Crim. No. 17825. First Dist., Div. Two. May 14, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS THYGESEN et al., Defendants and Appellants.

896

COUNSEL

Stephens & Williams and Pano Stephens for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Donna Petre, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KANE, Acting P. J.**—Defendants appeal from judgments of conviction finding them guilty of: (1) violating section 11010 of the Business and Professions Code[1] (offer to sell or lease subdivided lands without written notification to the Real Estate Commissioner); (2) violating section 11018.2 B. and P. (offer to sell or lease parcels of land from the Real Estate Commissioner); and (3) nine counts of violating section 506b of the Penal Code[2] (receipt of prorated payments for taxes under a real property sales contract and failure to place the amounts in a trust fund or to disburse money without consent of payors or other persons holding an encumbrance on the property).

In seeking a reversal, defendants contend that:

1) B. and P. section 11021 is constitutionally invalid and deprived defendants of their rights to due process and speedy trial.

2) The court erred in its instructions on the subdivision law and the statute of limitations.

3) The court misconstrued B. and P. section 11021.

4) P.C. section 506b offenses require instructions based on theft and embezzlement.

5) The court misconstrued P.C. section 506b.

---

[1]All further references to the Business and Professions Code will be designated as B. and P.

[2]All further references to the Penal Code will be designated as P.C.

6) The evidence on counts three through eleven (all charging violations of P.C. § 506b) is insufficient to sustain the convictions. For reasons which follow, we find no merit in any of these contentions and accordingly affirm the judgments.

FACTS

In 1964, defendant Dennis Thygesen met Elias Thermos at Southern Illinois University where both were graduate students in the Department of History. In 1970, Dennis Thygesen met Thermos and told him that he and defendant Patricia Thygesen (aka Patricia Lane and Patricia Diefendorf) were members of the California Agrarian League (hereinafter CAL),[3] an organization whose purpose was to help settle people in Northern California. Mr. Thermos, considering a move to California, decided to purchase land in Mendocino County. A deed dated July 21, 1970, granted approximately 40 acres of land to him from Mr. and Mrs. Richard Holm and Janet Holm Ramsay. Later that year, however, he accepted a teaching position in Texas and asked Dennis Thygesen to sell his land. In October 1970, he signed an individual grant deed from himself to Dennis Thygesen. After he signed this document, however, he deeded an additional 10 acres of the land to Mr. and Mrs. David Baxter. This deed was recorded in November 1970. As a result, the county billed the Baxters directly for the payment of real estate taxes. Other deeds for 10 acres were issued by Elias Thermos to Mr. and Mrs. Paul Stephens, Mr. Gregory Lightfoot and Mr. Robert Bragg, signed " ' "by Dennis Thygesen his attorney in fact." ' " Mr. Thermos never recalled giving either defendant Patricia Thygesen or defendant Dennis Thygesen a power of attorney. Although Mr. Thermos stated that he never received any money from Baxter, Lightfoot or Bragg, a senior escrow officer for the Redwood Empire Title Company testified that a check for $7,563.90 was mailed to him.

One of the purchasers of the subdivided parcel, Mrs. Sylvia Stephens, testified that she met defendants in their home in December 1970 to discuss buying property located off Covelo Road. She and her husband purchased 10 acres, and made their real estate tax payments to CAL from the time of the purchase until 1975. At no time did they give defendants permission to use tax payments for any other purpose. Their deed was recorded in October 1975.

[3]In March 1970, Dennis Thygesen and Patricia Lane signed a certificate stating that they were doing business in selling and buying land under the fictitious business name of California Agrarian League.

Another purchaser, Mr. Gregory Lightfoot, met defendants in February 1971, after reading an ad in a television program publication on land for sale in Mendocino County. Defendant Dennis Thygesen showed him a 10-acre parcel, which he purchased for $6,500. He made his checks for principal, interest and real estate taxes to CAL from 1971 until 1977. His post-sale correspondence was with Patricia Thygesen. At no time did he give defendants permission to use his tax payments for any other purpose. His deed was recorded in November 1975.

The last purchaser of the subdivided Thermos parcel was Mr. Robert Bragg (see *infra,* p. 901).

The taxes on the parcels owned by Mr. and Mrs. Stephens, Gregory Lightfoot and Robert Bragg were not paid for the 1970-1971, 1971-1972, 1972-1973, 1973-1974, and 1974-1975 tax years.

Defendant Patricia Diefendorf purchased 30 acres of land to the west of Elias Thermos' parcel from Mr. Robert Barnes. The grant deed was recorded on November 6, 1969. She then began subdividing the property into five- and ten-acre parcels.

Among the first purchasers was Christine Mulder, who in the fall of 1969 met Dennis Thygesen off Covelo Road in order to see property advertised in the Berkeley student newspaper. She purchased five acres for $4,000, and began making real estate payments to CAL through 1975. Patricia Thygesen handled most of the postsale correspondence. At no time did Mulder give either of the defendants permission to use her tax payments for any other purpose. Her deed was recorded in December 1974.

Mr. Channing Woodsum, while a student at San Francisco State, read a newspaper ad on the sale of land in Mendocino County. In March 1970, defendants showed him the land located near Covelo Road. He purchased a 10-acre lot for $7,000, and began making payments to CAL for principal, interest and real estate taxes.[4] At no time did he give defendants permission to use his tax payments for any other purpose. When he learned that the taxes on his property were delinquent, he telephoned Dennis Thygesen for an explanation. He was never able to receive a satisfactory answer as to where his tax money was. His deed was recorded in December 1974.

---

[4]In 1972, as instructed, he mailed his real estate tax payments to Old Security Financial in Sacramento.

Mr. and Mrs. Paul Irwin met defendants through their friends, the Harveys. They were shown land located in Mendocino off the Dos Rios-Covelo Road. They signed a contract of sale for five acres, and made payments to CAL on principal, interest and real estate taxes from 1971 through 1975-1976. Twice a year they received notices from Patricia Thygesen regarding payment of their taxes. At no time did they give either of the defendants permission to use their tax payments for any other purpose. Their deed was recorded in December 1974.

Mr. Robert Bragg, in response to an ad on the sale of country property, met defendants in January 1970 on Covelo Road. He signed a contract of sale for five acres of land. He paid his principal, interest and real estate tax payments to CAL from the time of purchase until 1976 on this property as well as on the other 10 acres he purchased from Thermos. Most of his post-sale correspondence was with Patricia Thygesen. Although some of his tax payments were late, they were always paid along with the penalty assessment. He gave neither of the defendants permission to use his tax payments for any other purpose. His deed was recorded in January 1975.

Mr. and Mrs. DeNike purchased five acres in December 1969. Unlike the other purchasers of the subdivided Diefendorf parcel, their deed was immediately recorded. As a result, the county billed them directly on the payment of their real estate taxes.

The taxes on the parcels owned by Mulder, Woodsum, Irwin and Bragg were delinquent for the 1970-1971, 1971-1972, 1972-1973, 1973-1974 and 1974-1975 tax years.

Dennis Thygesen purchased two 40-acre parcels in the same area. The first parcel, purchased from a Mr. Barnes, was on the western boundary of the Diefendorf parcel. The deed was recorded on August 11, 1969. This parcel was also subdivided into 10-acre parcels.

Mr. Randall Abbott testified that in response to an ad in California Good Times on the sale of land in Mendocino County, he arranged to see the property. Defendants showed him a 10-acre parcel, the boundaries of which were marked with orange ribbons. He signed a contract of sale at the end of March 1970, for 10 acres, for $6,500, with an $800 down payment. From the date of purchase until 1975 he paid his principal, interest and real estate taxes to CAL. He never gave either of the

defendants permission to use his tax payments for any other purpose. His deed was recorded on June 17, 1976.

Mrs. Luann Graham met defendants in January 1970, when they showed her 10 acres of land. She and her husband and their friends, Mr. and Mrs. Harvey, purchased the land for $7,000, with a $700 down payment. Their checks for payment of principal, interest and real estate taxes were made out to CAL and mailed to Dennis Thygesen's ranch in Redwood Valley. Ninety percent of their correspondence regarding tax payments was with Patricia Thygesen. She mailed them notices twice a year on their tax bill. At no time did any of them give defendants permission to use their tax payments for any other purpose. They regularly paid their taxes from the time of purchase through 1974.

At the end of January 1970, Mr. George Forest met the defendants to see property for sale on top of a mountain off Covelo Road. He purchased 10 acres for $7,000 in February 1970. After his purchase until 1975, he received notices from Patricia Thygesen twice a year regarding his tax payments. He regularly paid his tax payments along with his payment of principal and interest on the land. Never did he give either of the defendants permission to use his tax payments for any other purpose. At the time of trial, his deed was still unrecorded.

Joan Simpel met Dennis Thygesen in January 1970 on Covelo Road. She purchased a 10-acre lot, and began paying real property taxes to CAL. While she was sometimes late in her payment, they were always paid. She never gave defendants permission to use the tax money for any other purpose.

This parcel of 40 acres, known as assessor's parcel #36-20-47, was delinquent for the tax years 1972-1973, 1973-1974, and 1974-1975. The parcel belonging to Randall Abbott was also delinquent for the 1975-1976 tax year.

The last 40- acre-parcel pertaining to this criminal action (violations of §§ 11010 and 11018.2 B. and P.) was purchased by Dennis Thygesen from Richard Holm and Janet Holm Ramsay. The deed was recorded on September 2, 1970. This parcel on the northern border of the Diefendorf parcel, was subdivided as follows: Mrs. Neva Laver met defendants in 1970 at acreage off Covelo Road. She and her ex-husband, Lloyd Nordby, purchased a 10-acre lot. She eventually resold the property to Nicholas Ruddimaker with the help of Dennis Thygesen. Mr. and Mrs.

Calvin Tondre purchased 10 acres. The deed was recorded in October 1970. Mr. and Mrs. Fred Rusk, Jr. purchased 10 acres. Their deed was recorded in July 1974. Lastly, Joan Simpel purchased a 10-acre parcel of land.

## DISCUSSION

■ Defendants first contend that section 11021 B. and P. allows the threat of criminal prosecution for an indefinite time, and that its application to them is a deprivation of due process and speedy trial. In the alternative, defendants contend that the prosecution was required, but failed, to plead or prove diligence in prosecuting them since authorities were allegedly aware of the violations for at least five years prior to the filing of the information. These contentions are patently frivolous.

Section 11021 of B. and P. provides: "For the purpose of calculating the period of any applicable statute of limitations in any action or proceeding, either civil or criminal involving any violation of this chapter, the cause of action shall be deemed to have accrued not earlier than the time of recording with the county recorder of the county in which the property is situated of any deed, lease or contract of sale conveying property sold or leased in violation of this chapter and which describes a lot or parcel so wrongfully sold or leased.

"This section does not prohibit the maintenance of any such action at any time before the recording of such instruments."

Significantly, the act of recordation lies within the control and power of the sellers of subdivided land—in this case, defendants themselves.

In support of their claim of unconstitutionality of section 11021 B. and P., defendants cite the cases of *People* v. *Doctor* (1967) 257 Cal.App.2d 105 [64 Cal.Rptr. 608], and *People* v. *Zamora* (1976) 18 Cal.3d 538 [134 Cal.Rptr. 784, 557 P.2d 75]. However, significant differences exist between the cited cases and the case at bar. In *Doctor,* section 3710.2 of the Labor Code conditioned the running of the statute on " ' "discovery by the director or his designated agents of the failure to secure the payments of compensation. . . ." ' " (P. 107.) The challenge of the statute based on its unconstitutionality was successful because it permitted the director to determine in his *sole* discretion when the statute of limitations began to run (p. 109). In *Zamora,* the court was dealing with a statute (P.C. § 800), which, by a 1969 amendment, specifically provided for the

limitations period in grand theft cases to be governed by discovery of the crime. Unlike the statutes in these cases, section 11021 B. and P. does not leave to the discretion of the prosecuting authorities the matter of when the statute of limitations accrues. *The statute begins to run on the act of recordation.* Thus, the state cannot indefinitely suspend the prosecution of violators.

Defendants argue that even if the statute of limitations is sufficiently limited, it expired in November 1973. In support of this argument, defendants allege that the authorities had actual knowledge of the violations based on the facts that 1) the entire four parcels purchased and sold were considered one subdivision (a fact not supported by the record); 2) the assessor's office knew of the division of the parcels in 1970-1971; and 3) with the recordation of several other deeds in the various property sections, the authorities were required to consider not only the parcels conveyed, but also those retained by the subdivider in determining whether a "subdivision" had been created (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 22 [141 Cal.Rptr. 20, 569 P.2d 125]).

Neither the reading of one nor the collective reading of the above three purported facts establishes actual knowledge by the authorities of the violations several years before the filing of the information.

The definite nature of the limitations period having been established, and actual knowledge by the prosecutor of the violations several years before filing the information not having been shown, it follows that the prosecution was justified in its reliance on section 11021 B. and P., and was not required to plead and prove diligence.

Defendants next contend that the trial court erred in its instructions on the subdivision law and statute of limitations.

■ With regard to the instructions on the subdivision law, defendants contend that sections 11010 and 11018.2 of B. and P. require a special mental element on the part of the perpetrator, and that the trial court therefore erred in instructing the jury that the subdivision violations in counts one and two required only a showing of general criminal intent. This contention is meritless.

We recently held in *People* v. *Park* (1978) 87 Cal.App.3d 550, 562 [151 Cal.Rptr. 146], that failure to register securities prior to sale as required

under Corporations Code, section 25110, is an *ipso jure* violation of the section. Similarly, failure to notify the commission in writing of intent to sell or lease subdivided lands and failure to obtain a public report from the commissioner are *ipso jure* violations of sections 11010 and 11018.2 B. and P. Where, as here, the primary purpose of the statutes is regulation rather than punishment or correction, the doctrine of strict criminal liability is appropriate (see *People* v. *Travers* (1975) 52 Cal.App.3d 111, 115 [124 Cal.Rptr. 728]). Thus, the trial court correctly refused to give the requested instructions on specific intent.

Secondly, defendants contend that the court should have given an instruction on the import of the contiguousness of the parcels in ascertaining whether there was a violation of sections 11010 and 11018.2 B. and P. Defendants argue that if contiguous parcels were in fact added together by the jury (although no instructions authorized such action), then the original 40- and 30-acre parcels purchased and sold by defendants before acquiring the remaining two 40-acre parcels would have started the limitations period with recordation of the DeNike deed in December 1969, and the latter recordation of the Baxter and Tondre deeds in 1970.

The record reflects that the court did instruct the jury on just this matter.

■ To constitute a subdivision, for the purposes of section 11000 B. and P., parcels need only constitute a single subdivision project (*People* v. *Pacific Land Research Co., supra,* 20 Cal.3d at p. 23, fn. 13). The parcels in this case were physically contiguous. Defendant Patricia Diefendorf's property was bordered on the north, west and east by parcels owned by her future husband, defendant Dennis Thygesen. The record indicates that defendants were in the business of selling and subdividing the land as a whole through their organization, CAL. Within a short period of time after they acquired the property, they solicited buyers and sold the individual lots.

Thus, not only did the court give an instruction regarding the creation of subdivided lands, but also the instruction given was a proper one.

■ Defendants next contend that the trial court misconstrued section 11021 B. and P. by instructing the jury that "The recordation of *any* deed within a subdivision constitutes a new cause of action on which a prosecution for Business and Professions Code, Section 11010 and

Section 11018.2 may be based." (Italics added.) Defendants assert that "the proper interpretation of the word *'any'* deed, lease or contract of sale with reference to the offenses charged in Counts One and Two herein is *'a'* deed, lease or contract of sale."

A review of the legislative history of section 11021 B. and P. refutes this assertion. When the section was adopted in the 1949 Regular Session of the Legislature (ch. 817, § 1, p. 1559), it read: "For the purpose of calculating the period of any applicable statute of limitations in any action or proceeding, either civil or criminal involving any violation of this chapter, the cause of action shall be deemed to have accrued not earlier than the time of recording with the county recorder of the county in which the property is situated of *a* deed conveying property subdivided in violation of this chapter and which describes a lot or parcel so wrongfully subdivided.

"This section does not prohibit the maintenance of any such action at any time before the recording of such instrument." (Italics added.) However, this section was amended in 1955 (Stats. 1955, ch. 1739, § 3, p. 3199) to read in pertinent part that ". . . the cause of action shall be deemed to have accrued not earlier than the time of recording . . . of *any* deed, lease or contract of sale conveying property sold or leased in violation of this chapter . . ." (italics added). This amendment clearly indicates the legislative intent that whenever "any deed, lease or contract of sale" is recorded in violation of the chapter, a new cause of action accrues.

Furthermore, as the trial judge aptly pointed out, a contrary interpretation would permit a person to set up a large subdivision, immediately record one deed, wait three years and completely escape prosecution on the subsequent, numerous sales.

■ Defendants also contend that P.C. section 506b offenses require instructions based on theft and embezzlement and that the court erred in its refusal to give those instructions.

The court refused the grand and petty theft instructions, saying: "The defendant has requested a series starting with 14.20 which requests for instruction on grand and petty theft, and those are all refused. The charges here are violation[s] of specific sections and not grand and petty theft." Defendants concede that the Legislature intended to impose criminal penalties for violations of Civil Code, section 2985.4. The

penalty is found in section 506b P.C.: "Any person who violates Sections 2985.3 or 2985.4 of the Civil Code, relating to real property sales contracts, is guilty of a public offense punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the state prison, or in the county jail not exceeding one year, or by both such fine and imprisonment."

While section 506b P.C. provides for its violation to be punished as either a misdemeanor or a felony, this section clearly deals with the *punishment* aspect of the violation of Civil Code, section 2985.4, and has nothing to do with the aspect of determining the innocence or guilt of a person charged with a violation of that Civil Code section. The jury normally has nothing to do with punishment or sentence except in the unusual cases where a statute has given them that power (2 Witkin, Cal. Crimes (1963) § 905, p. 860; *People* v. *House* (1970) 12 Cal.App.3d 756, 767 [90 Cal.Rptr. 831]). Neither section 506b P.C. nor Civil Code, section 2985.4 has given the jury that power.

With regard to the embezzlement instructions, the court on its own motion, after refusing to give the requested embezzlement instructions, offered: ". . . if you wish to submit one, I will give an instruction to the jury telling them that the use of the word 'embezzlement' is not appropriate and they should confine themselves to what they have been charged here." Over the objections of the prosecution, defense counsel accepted the court's offer and submitted the following instruction which was given to the jury: "The term embezzlement has been used during the conduct of this case. You are to disregard the use of that term regardless of whether it was used by the court, either counsel, or any witness. The term embezzlement has no application to this case and is not to be considered or utilized by you for any purpose in your deliberations in this case." It must be presumed that the jurors observed and correctly applied the instructions given them (*People* v. *Romo* (1975) 14 Cal.3d 189, 195 [121 Cal.Rptr. 111, 534 P.2d 1015]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 356 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Valerio* (1970) 13 Cal.App.3d 912 [92 Cal.Rptr. 82]).

The defendants further assert that even though this instruction was submitted by the defendants themselves, this is insufficient reason for refusing their requested mistrial. They argue that they are entitled to attempt to minimize the effect of error and still urge that error as grounds for relief, citing *People* v. *Musumeci* (1955) 133 Cal.App.2d 354 [284 P.2d 168] as authority. The *Musumeci* court itself, at page 362, cites the general

rule that when an instruction is requested by the accused and given by the court, the accused cannot then find fault with the court for complying with his request. The court found exception to the general rule based on the specific factors involved in that case. Those factors are unique to the *Musumeci* case, and there appears nothing in the record of the case at bench to deviate from the general rule.

■ The defendants next contend that the court erred in construing section 506b P.C.

The court instructed the jury that section 506b P.C. is violated "if a seller of improved or unimproved real property under a real property sales contract receives pro rata payments for taxes and does not hold these amounts in trust for the purpose designated *or* disburse the payments for any other purpose without the consent of the payor and any person or corporation holding an encumbrance on the property." (Italics added.) In effect, the instruction was restating what constitutes a violation of Civil Code, section 2985.4, which provides in pertinent part that "Every seller of improved or unimproved real property under a real property sales contract who receives pro rata payments for insurance and taxes shall hold these amounts in trust for the purpose designated. These amounts shall not be disbursed for any other purpose without the consent of the payor and any person or corporation holding an encumbrance on the property."

In arguing that the instruction was "open-ended" and therefore "allowed the jury to convict appellants for every conceivable failure to hold in trust . . . ," the defendants overlook the fact that the beginning of the instruction limits its application to a seller of improved or unimproved real property, to a situation involving a real property sales contract, and to a situation whereby pro rata tax payments are received by that seller. The instruction was specific and proper.

Defendants further contend that it was incumbent on the court to give instructions to the jury upon the subject of what constitutes a failure to hold in trust under the sections here relevant. The defendants themselves requested the following instruction given by the court which encompasses just this subject: "As used in these instructions, the word 'trust' refers to and means a right of property held by one party for the benefit of another, and the phrase 'in trust' refers to and means the delivery of property to another upon a certain confidence regarding his holding, use or disposal of that property."

■ Lastly, defendants claim that there is insufficient evidence to sustain the convictions on counts three through eleven. These counts charged defendants with a violation of section 506b P.C. in that they failed to place pro rata payments for real estate taxes under a real property sales contract in a trust fund designated for such payment or disbursed such money for purposes other than payment of taxes without the consent of the payors. A review of the record as to each count provides more than sufficient evidence to sustain each of the convictions.

For the 1970-1971 tax year, assessor's parcel number 36-20-32 was divided into four parcels: 36-20-48, 36-20-49, 36-20-50, and 36-20-51. Robert Bragg owned parcel 50. Parcel 48 was further subdivided into 36-20-74, 36-20-75, and 36-20-76. Christine Mulder, Channing Woodsum and Paul Irwin purchased lots 74, 75, and 76, respectively. Parcels 48 and 50 were delinquent for the 1970-1971, 1971-1972,[5] 1972-1973, 1973-1974, and 1974-1975 tax years.

COUNT THREE: Christine Mulder testified that she mailed her money for real estate taxes to CAL from the time of purchase in 1970 until April 1975. All the checks she mailed to defendants were cashed. At no time did she give defendants permission to use this money for any purpose other than for payment of real estate property taxes.

COUNT FOUR: Channing Woodsum testified that he made tax payments to CAL from 1970 to 1972, and then to Old Security Financial in Sacramento from 1972 to 1975. At no time did he give defendants permission to use this tax money for any other purpose.

COUNT SEVEN: Paul Irwin testified that he also made his tax payments to CAL. All the checks he mailed were cashed. At no time did he give defendants permission to use this tax money for any other purpose.

Assessor's parcel 36-20-22 was delinquent for the 1970-1971 tax year. The following year the parcel was subdivided into three parts, 36-20-57, 36-20-58, and 36-30-59. Parcel 58 was further divided into 36-20-77 and 36-20-78. Taxes on parcels 57, 77 and 78 were unpaid for the 1971-1972, 1972-1973, 1973-1974 and 1974-1975 tax years. Mr. and Mrs. Stephens owned parcel 57. Parcels 77 and 78 were owned by Gregory Lightfoot and Robert Bragg, respectively.

[5]Tax payments for 1970-1971, and 1971-1972 trailed by one year. After 1973-1974, the back taxes went unpaid as well as the assessment for the coming year.

COUNT SIX: Sylvia Stephens testified that she paid her taxes to CAL from 1970 until 1975. All the checks were cashed. At no time did she give defendants permission to use the tax money for any other purpose.

COUNT TEN: Robert Bragg testified that he paid his real estate taxes by checks to CAL from the time of purchase until 1976. All checks mailed were cashed, and he received receipts for his 1973-1974 and 1974-1975 tax payments. At no time did he give defendants permission to use this money for any other purpose.

COUNT FIVE: Gregory Lightfoot testified that he paid his real estate taxes to CAL from 1971 to 1977. All his checks for taxes were cashed. At no time did he give defendants permission to use the money for any other purpose.

Assessor's parcel 36-20-47 was delinquent for tax years 1972-1973, 1973-1974 and 1974-1975. In 1975-1976 the parcel was divided into 36-20-72 and 36-20-73. For the 1975-1976 tax year, parcel 72 was delinquent. Randall Abbott and George Forest owned parcel 72; Graham/Harvey owned parcel 73.

COUNT EIGHT: George Forest testified that he made his tax payments to CAL from 1970 through 1974. He had no idea where the proceeds of money went. At no time did he give defendants permission to use the money for any other purpose.

COUNT NINE: Luann Graham testified that she paid her real estate taxes by check to CAL from time of purchase in 1970 until after her 1974 taxes were paid. All the checks she mailed were cashed. At no time did she give defendants permission to use the money for any other purpose.

COUNT ELEVEN: Randall Abbott testified that he paid his real estate taxes by check to CAL from 1970 to 1975. At no time did he give defendants permission to use money for any other purpose.

The victim-purchasers of the subdivided parcels in counts three through eleven each sent to defendants money to pay their respective real estate taxes. In each case the defendants cashed the checks. In each case the taxes were unpaid. Based upon the foregoing, we conclude that the claim of insufficient evidence to sustain the convictions in counts three through eleven is ill-founded.

## Disposition

The judgments are, and each is, affirmed.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied June 13, 1979, and appellants' petition for a hearing by the Supreme Court was denied August 1, 1979.